(54 Misc. Rep. 96)

NAPIER v. SPIELMANN et al.

(Supreme Court, Trial Term, New York County. April 29, 1907.)

1. CONTRACTS—BREACH—CONSPIRACY—BURDEN OF PROOF.

Where plaintiff alleged that by reason of a conspiracy between defendants and certain other parties, plaintiff was deprived of the benefit of an agency for the sale of silk, the burden of proving such conspiracy was on plaintiff, who had to sustain it by something arising to the dignity of proof, as distinguished from mere suspicious circumstances.

2. SAME—MODIFICATION BY ORAL AGREEMENT.

Where, by a contract under seal, plaintiff was to have the sale of the entire product of certain silk mills, which products were to be consigned to defendants, an oral modification of the contract by defendants, so that plaintiff was not required to procure the consignment of the entire products, but only so much as he was able to procure, was binding on defendants only so far as executed, and as to future consignments defendants had the right to demand the consignment of the entire products of the mill.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 11, Contracts, § 1124.]

3. DAMAGES—BREACH OF CONTRACT.

Where plaintiff was to procure the consignment to defendant of the entire manufactured product of certain silk mills, and was to receive from defendants a certain commission on the sale of such product, his measure of damages in an action for breach of the contract was the value of his contract, if he had been allowed to perform it.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 15, Damages, §§ 291, 302.]

4. SAME—DUTY TO REDUCE DAMAGES.

Where plaintiff was to procure the consignment of the entire product of certain silk mills to defendants, and was to receive a certain commission on the sale of the goods, defendants agreeing to provide a store for the sale of the goods and a porter and entry clerk at their own expense, plaintiff, on the breach of the contract by defendants, had no right to continue

his equipment for the performance of the contract, and charge defendant with office or store rent and the salary of such porter and entry clerk.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 15, Damages, §§ 128–131.]

5. CONTRACTS—BREACH—EVIDENCE.

Where plaintiff agreed that the entire products of certain silk mills should be consigned to defendants, who in turn were to pay plaintiff a certain commission on the sale of the products, defendants, in an action for breach of the contract, were not precluded from showing that the manufacturer of the silk, by discharging plaintiff from his employment and refusing to consign the goods for sale by him, had prevented him from performing his contract.

Action by Thomas S. Napier against Charles Spielmann and others. Defendants move, upon the trial justice's minutes, to set aside the verdict and grant a new trial, upon all the grounds specified in Code Civ. Proc. § 999. Motion granted.

Rushmore, Bisbee, Rogers & Stern (Charles E. Rushmore, of counsel), for the motion.

Olney & Comstock (J. Noble Hayes, of counsel), opposed.

GIEGERICH, J. This is a motion by the defendants, upon my minutes, on the grounds specified in section 999 of the Code of Civil Procedure, to set aside the verdict which the jury rendered against them for $13,000 in an action to recover damages claimed to be the result of a breach of the contract hereafter referred to. The verdict is sought to be upheld upon the theory that the plaintiff was prevented by the defendants from performing. The contract, which was entered into in July, 1900, recites that the plaintiff was a member of the firm of Westerhoff Bros. & Napier, doing business at Paterson, N. J., and also at Ephrata, Pa., where they were manufacturers of silk goods, and that said firm managed and controlled the Pennsylvania Silk Company, of Fleetwood, Pa., and that they desired, through the plaintiff, to make a business arrangement and contract whereby they might obtain from the defendants certain financial and commercial advantages in connection with the business to be conducted by the plaintiff. The contract, among other provisions, contains the following: On the part of the plaintiff it was agreed, among other things, that Westerhoff Bros. & Napier and the Pennsylvania Silk Company should consign to the plaintiff "the entire manufactured product of said respective concerns"; that he, the plaintiff, should "attend to the sale of the said consigned goods, engage, provide, and keep a competent force for the handling and sale of the products of said mills, including competent traveling salesmen, and will defray all the expenses thereof." The defendants, on their part, agreed to make advances to the mills, provide an annex for the sale of the goods and also a porter and an entry clerk at their own expense, bill the merchandise in their name, which bills and invoices should be payable to them, provide the plaintiff with ordinary stationery, and keep the merchandise insured. The contract also provides:

"There shall be deducted from the account sales rendered to the respective consignors and retained by the party of the second part [the defendants] a commission of seven and one-half per cent. (7½%) upon the net amount of sales,

the cash discount allowed to customers being first deducted. Out of this commission there shall first be allowed to the party of the second part [the defendants] a commission of three and one-half per cent. (3½%), to be computed upon the gross amount of sales made of said consigned goods, and the balance is to be credited to the account of the said Thomas S. Napier [the plaintiff], and said commission of three and one-half per cent. (3½%) shall be in full for the guaranty of the party of the second part [the defendants] upon the said sales, and the expenses by it in this agreement agreed to be borne, and for supplying said financial and commercial advantages provided for in this agreement. * * * This agreement shall begin on the first day of August, in the year one thousand nine hundred, and shall continue for one year, and shall thereafter continue from year to year unless either of the parties hereto shall within three months before the first of August in any year give notice of their intention to discontinue the same."

It appears from the evidence that the contract in suit was made with the consent of Peter D. Westerhoff and Henry Westerhoff, who, together with the plaintiff, constituted the said firm of Westerhoff Bros. & Napier, and that such contract was made in contemplation of an arrangement to incorporate such firm under the laws of the state of New Jersey; that in pursuance thereof a certificate of incorporation was filed with the Secretary of State of New Jersey on August 3, 1900; and that prior and subsequent to the incorporation both the firm and the corporation recognized and adopted the contract, and· shipped and consigned a part of the product of their silk mills to the defendants, and paid them the commission as plaintiff had agreed they should pay, and consented that the plaintiff should act as the sole selling agent, of the consigned goods. It further appears from the evidence that at a meeting of the Westerhoff Bros. & Napier Company, held on October 10, 1904, and at which the plaintiff was present, the following resolution was adopted:

"Whereas, the selling end of the Westerhoff Bros. & Napier Company, conducted by T. S. Napier at 31 Greene street, New York City, has proven unsatisfactory during the past year, and it seems to be to the interest of said company that a change be made in said selling department at 31 Greene street, New York City: Therefore, be it resolved, that the said Westerhoff Bros. & Napier Company empower its president to hire and employ such men as he may deem necessary to sell any and all goods in said store, or to transfer any stock and merchandise now in said store or that may hereafter be shipped there by said company. And be it further resolved, that the services of said T. S. Napier as salesman in said store be, and the same hereby are, dispensed with, and his salary to cease and be discontinued from and after the 16th day of October, 1904."

The plaintiff claims that such resolution was the result of a conspiracy between the defendants and Peter D. Westerhoff and Henry Westerhoff. While there is sufficient evidence in the case to warrant a finding by the jury that the defendants evicted the plaintiff from the annex or store above referred to on October 19, 1904, yet the record does not contain a particle of evidence connecting them with the action so taken by the said corporation on October 10th. The plaintiff argues, however, that a conspiracy on the part of the defendants, in conjunction with the said Westerhoff Bros., to bring about his discharge as the selling agent of the said corporation has been shown to· exist, because the defendant Spielmann failed to testify positively that the defendants had not introduced the Westerhoffs to their lawyer

prior to the day of the passage of the resolution above set forth. But this hardly warrants an inference that the introduction took place before October 10th. But, even if the introduction was prior to that date, such fact does not connect the attorney or the defendants with the action so taken by the corporation in discharging the plaintiff as its selling agent. The record is devoid of proof that the defendants, or either of them, owned, either directly or indirectly, any stock of the said corporation, or that they had it in their power to control the action of those having a controlling interest therein. That they had no such power is evidenced by the efforts of the defendant Spielmann before the plaintiff's discharge to adjust the latter's differences with the Westerhoff Bros. & Napier Company, and, by the threat of those controlling such corporation, after such discharge, to take away its accounts from the defendants.

The burden of proving that there was a conspiracy of the character alleged between the defendants and Westerhoff Bros. is upon the plaintiff, who must sustain it by something rising to the dignity of proof, as distinguished from mere suspicious circumstances. Lupinek v. Woytisek, 110 App. Div. 688, 690, 97 N. Y. Supp. 471. There is nothing here to indicate that the defendants or their counsel had anything whatever to do with the passage of the resolution of October 10th. On the contrary, the defendant Spielmann testified, without contradiction, that he first learned of the plaintiff's discharge through Mr. Westerhoff a few days after October 10th, that he did not know in advance that the resolution was to be introduced or adopted, that he never heard it discussed, and that he never had any talk with the Westerhoffs or their counsel in regard to it. Neither was the conspiracy established by the facts that about two weeks before the adoption of the resolution the defendant Spielmann endeavored to bring the Westerhoffs and the plaintiff together with a view of composing their differences, and that subsequent to the passage of such resolution, viz., on October 19, 1904, the defendants did, as alleged by the plaintiff, evict him from the so-called annex, and on November 16, 1904, make a new contract with the Westerhoff Bros. & Napier Company for the consignment of the entire manufactured product of their mills from and after January 1, 1905. Stress is laid by the plaintiff upon the testimony of the defendant Spielmann to the effect that the Westerhoffs had threatened not to send to the defendants any more of their manufactured products while the plaintiff was in the annex; but an examination of the stenographer's minutes shows that such threat was made after the plaintiff's discharge by the corporation and at the time of his alleged ejectment from the annex. Moreover, it appears from the evidence that the corporation did not send any more goods to the defendants' annex after the plaintiff's discharge, and, in fact, that its officers refused to send any more while he was in the annex. In support of the charge of conspiracy the plaintiff also urges that the defendants gained a distinct advantage under the new contract; but, upon reading the same, I do not find such to be the fact. Neither did they gain anything by the addition of the Jamesburg and Denver mills, as the defendants, upon the proof, were already entitled to the same. Summing up my conclusion upon this head, I am of the opinion that

the plaintiff has failed to establish any fact tending to show a combination by the defendants with the Westerhoffs to effect his discharge on or prior to October 10, 1904, or any fact from which a motive to effect such discharge could be inferred.

The plaintiff contends, however, that, irrespective of the question whether or not he has established a conspiracy, the verdict should be sustained on the ground that the contract was modified by the oral agreement of the parties, and that on October 19, 1904, the defendants, by evicting him from the annex, prevented him from further performing the contract as modified. The plaintiff testified that modifications of the contract were made by the oral agreement of the parties, whereby he was not required to procure the consignment of the entire product of the mills of Westerhoff Bros. & Napier Company, but only so much thereof as he was able to procure. The alleged conversations that are claimed to have resulted in such modification were denied by the defendants, and are alleged to have taken place about the beginning of the year 1902, and some time before August 1st in each of the years 1903 and 1904. The original contract is under seal, and hence the defendants had the right, at any time during the continuance of the contract, no matter what parol modifications might previously have been made, to demand of the plaintiff full performance of the contract as originally sealed. McKenzie v. Harrison, 120 N. Y. 260, 24 N. E. 458, 8 L. R. A. 257, 17 Am. St. Rep. 638; Hayne v. Sealy, 71 App. Div. 418, 75 N. Y. Supp. 907; Howie v. Kasnowitz, 83 App. Div. 295, 82 N. Y. Supp. 42. The rule applicable to the present case was laid down in McKenzie v. Harrison, supra, where the action was brought to recover rent upon a lease under seal for a term of 10 years at an annual rental of $4,500. It was alleged that after the defendants had occupied the premises for one year, and paid the rent in full, the plaintiff agreed orally to reduce the rent to $3,500 per annum; that rent was paid at this reduced rate for three years, the lessors giving receipts for that amount in full; and that after this had continued for three years the lessors notified the defendants that they wished them to pay the amount of rent originally provided for, which the defendants did until the commencement of the suit. In holding that the defendants should have been allowed to offer proof to establish the making of this alleged oral agreement the court said (page 263 of 120 N. Y., page 459 of 24 N. E., 8 L. R. A. 257, 17 Am. St. Rep. 638):

"We shall not question the rule that a contract or covenant under seal cannot be modified by a parol unexecuted contract. Coe v. Hobby, 7 Hun, 157, on appeal 72 N. Y. 141, 28 Am. Rep. 120; Smith v. Kerr, 33 Hun, 567–571, on appeal 108 N. Y. 31, 15 N. E. 70, 2 Am. St. Rep. 362. Neither shall we question the views of the court below to the effect that the alleged oral agreement in this case to reduce the rent $1,000 per year was void and inoperative, in so far as it remained unexecuted. The lessors had the right to repudiate it at any time and demand the full amount of rent provided for by the lease; but, in so far as the oral agreement had become executed as to the payments which had fallen due and had been paid and accepted in full as per the oral agreement, we think the rule invoked has no application."

In the case at bar goods were consigned by Westerhoff Bros. & Napier Company, to the defendants up to within a few days of the

adoption of the resolution of October 10th, and assuming, as we must from the finding of the jury, that they were received without objection by the defendants, and that they were not the entire manufactured product of the mills in question, the contract, so far as such goods are concerned, must, under the principle of the cases above cited, be deemed to have been modified, and duly executed as modified; but as to future consignments the defendants had the right, so long as the contract remained in force, to repudiate the oral agreement at any time and demand the consignment of the entire manufactured product of the mills mentioned in the contract. The proof shows that the plaintiff had on hand in the annex at the time of the alleged eviction consigned goods amounting to $112,103 gross and $104,225 net, and it becomes of primary importance to determine the respective rights and liabilities of the parties with respect thereto. The contract in suit contains a provision that:

"In the event of inability of the respective consignors to pay and reimburse the party of the second part [the defendants] for any advances made by it after reasonable demand upon the party of the first part [the plaintiff] therefor, and in the event of neglect and refusal of the party of the first part [the plaintiff] to perform any of the terms of this agreement, and also at the expiration of this agreement the party of the second part [the defendants] shall have the absolute right to sell all goods remaining on hand, either at private sale or public auction, at the best prices obtainable therefor, and shall give notice of the time and place of sale to the party of the first part by registered mail; and out of the proceeds of such sale the party of the second part [the defendants] shall reimburse itself for all amounts due to it by the respective consignors, including all expenses of such sale or sales, and pay over any surplus to the respective consignors or their legal representatives. The party of the second part [the defendants] shall have a direction as to the time and place in the making of said sales as herein provided."

It clearly appears from the foregoing provisions, as well as from others above quoted, that the plaintiff should sell all goods consigned to the defendant, except where (1) the consignors are unable to reimburse the defendants for advances made; (2) where the plaintiff neglects and refuses to perform any of the terms of the agreement; or (3) when the contract has expired. There is thus disclosed an intention on the part of the parties to the contract to secure the plaintiff the fruit of his labors by providing, as above noted, that he shall "attend to the sale of the said consigned goods," except in the three events above specified. No question arises in respect to the first of these, and it is not necessary to discuss it. In order to bring the case within the second it must be shown that such nonperformance of the contract is the result of the act or omission of the plaintiff, and not of some other persons. In other words, such failure to perform must be due to the personal neglect or refusal of the plaintiff. There is not a particle of evidence in the case which would support a finding of such delinquency on his part. The third claim, as I construe it, only contemplates a case where the agreement has expired by its own limitation, and not by operation of law; and since neither party gave the three months' prior notice to discontinue, as required by the contract, the case does not fall within the third and last provision. In this view the defendants could not by any act of theirs deprive the plaintiff of the right to sell so much of the consigned goods as were on

hand at the time of the alleged eviction on October 19, 1904. As already shown, the plaintiff was entitled under the contract to sell all the goods which the Westerhoff Bros. & Napier Company consigned to the defendants during the continuance of the contract, except in the three cases above mentioned, and he had a reasonable time within which to make such sale. The plaintiff testified that when he was evicted he had already sold two-thirds of the consigned goods on hand ready for delivery. The evidence fairly supports a finding by the jury that the defendants prevented the plaintiff from delivering the goods so sold by him and from selling the remainder of the consigned goods which were on hand at the time of the alleged eviction. In these circumstances a cause of action immediately accrued in favor of the plaintiff, which was not affected by the fact that one Theodore Wunderlich, the selling agent under the new agreement between the Westerhoff Bros. & Napier Company, delivered the goods so sold by the plaintiff, and sold the remainder of the goods on hand at the time of the eviction. In submitting the case to the jury the court charged that, in case they found the plaintiff was entitled to recover, his measure of damage was such damage as they might find upon the evidence, was the value of his contract if he had been allowed to perform it. This instruction is in harmony with the rule laid down in Wakeman v. Wheeler & Wilson Mfg. Co., 101 N. Y. 205, 210, 4 N. E. 264, 54 Am. Rep. 676, and Dunham v. Hastings Pavement Co., 95 App. Div. 360, 88 N. Y. Supp. 835. The jury, however, awarded the plaintiff the full amount of the stipulated commissions, without any deductions. This they manifestly had no right to do, as the plaintiff himself testified, and it appears in the evidence throughout the case, and also by the contract itself, that he had to assume the burden of all the expenses of making the sales. That such expenses were contemplated as likely to be considerable will be seen from the following provision of the contract, viz.:

"The party of the second part [the defendants] shall advance to the party of the first part [the plaintiff] the sum of one thousand dollars ($1,000) during each month to cover the traveling expenses and salaries incurred by the party of the first part [the plaintiff], which amount shall be charged to the account of the party of the first part [the plaintiff]."

Moreover, under the doctrine laid down in the cases just cited, the measure of damages is, not the gross amount of the commissions which would have been payable to the plaintiff, but the value of his contract, which is what he would have made by performance; that is, the commissions less expenses. In Dunham v. Hastings Pavement Co., supra, the contract provided that the plaintiff should be the sole agent of the defendant to secure the rights to make bids for and introduce asphalt block pavement in New York City. For the services rendered by him it was provided that he should receive 15 cents per square yard for every yard of block asphalt laid in the city of New York. The defendant discharged him, and in an action brought to recover damages the court charged that his measure of damages was 15 cents per square yard on all the pavement laid after his discharge. The court, in reversing the judgment, said (at page 364, of 95 App. Div., and page 838 of 88 N. Y. Supp.):

"The result of these rulings was that the plaintiff was permitted to recover 15 cents per square yard on all the asphalt laid, and this irrespective of whether he rendered any service under the contract or could have procured the same amount to be laid. The contract required the plaintiff to devote his entire time and use his best efforts to procuring contracts from the city. Manifestly, if the defendant, after the contract was terminated, put forth extra efforts and thereby procured contracts which the plaintiff could not have procured, had the one in question not been broken, he was not entitled to the benefits derived therefrom. He was no more entitled to such benefits, if there were any, than he was to be deprived of his damage if defendant had not secured any contracts at all. He was entitled to recover the value of his contract. Wakeman v. Wheeler & Wilson Mfg. Co., 101 N. Y. 205, 4 N. E. 264, 54 Am. Rep. 676; Peltz v. Eichele, 62 Mo. 171; Wells v. Nat. Life Ass'n, 99 Fed. 222, 39 C. C. A. 476, 53 L. R. A. 33; Hitchcock v. Knights of Maccabees, 100 Mich. 40, 58 N. W. 640, 43 Am. St. Rep. 423. See, also, note in 53 L. R. A. 33, and cases cited. The value of his contract is what he would have made by performance. This is precisely what he was legally entitled to and what he morally ought to have, and as bearing upon that question it was competent to show what he made prior to the breach of the contract, as well as what was done by the defendant subsequent to it. In other words, the acts of both parties involved in or connected with the subject-matter of the contract, both before and subsequent to the breach, are proper facts to lay before the jury to enable it to determine what the contract was actually worth to the plaintiff. The case was not tried upon this theory. It was submitted to the jury under erroneous instructions as to the law, and it follows that the judgment and order appealed from must be reversed, and a new trial ordered, with costs to the appellant to abide the event."

While the plaintiff furnished data as to the total amount of sales of consigned goods during certain periods, he has wholly failed to submit any proof in support of the other above-stated prerequisites to recovery. On the point of damages it should be noted that the plaintiff testified that shortly after his alleged eviction he entered into an agreement with Boessneck, Broesel & Co., who agreed to pay, and have since paid, to him commissions at the average rate of 3¾ per cent. on the Hamburg Mill account, which he took from the defendants and placed in their hands; he having control of the same. The amount of goods on that account remaining unsold at the time of the alleged eviction was between $30,000 and $40,000. According to the plaintiff's testimony this mill consigned to the defendants, from about January, 1903, to the time of the alleged eviction goods amounting to $150,000. That this account was of importance and value may be judged from a comparison of the same with the aggregate sales on the accounts in suit; the highest under the latter in any contract year being $433,000. The plaintiff testified that he practically transacted no business of any profit for a period of 10 months or a year subsequent to the alleged eviction, and yet it appears from the evidence that during that period he brought to the said Boessneck, Broesel & Co. the account of the Brighampton Silk Company (which was organized after the alleged eviction) in addition to the said Hamburg Mill account. It will be recalled that according to the plaintiff's testimony the nine months following the alleged ejectment on October 19, 1904, to August 1, 1905, was a period of the greatest prosperity in the silk business known for many years, and that silks greatly advanced in price during that period and were in great demand. While this testimony shows that the plaintiff would in all likelihood have been equally

as successful in selling the balance of the consigned goods on hand as was his successor, if he had been permitted to continue to act as selling agent, I am at a loss to understand why the cost of selling such goods should be wholly charged up against the defendants, when, as seen, the plaintiff was receiving commissions on two other accounts opened with said Boessneck, Broesel & Co. during the period in question. He did not deliver any part of the consigned goods on hand on October 19th, although he claims to have sold some of them prior to that date. The delivery of such portion of the goods and the sale of the balance were not made by him. After his eviction he was free to devote all his time and all his disbursements to the sale and delivery of goods on his other accounts. Under such circumstances the plaintiff cannot fairly claim the entire commission of 4 per cent. which he was to receive pursuant to the contract in suit, and charge all the expenses incident to the maintenance of his office and the sale of consigned goods under his contract with said Boessneck, Broesel & Co. against his contract with the defendants.

The plaintiff claims, however, that "part of his loss under the contract was the loss of rent of the annex, a porter, bookkeeper, etc." While it is true that the defendants were to furnish an annex, a porter, and an entry clerk without expense to the plaintiff, it should be noted that the annex was provided solely with a view of selling goods consigned under the contract in question, and no others, and that the services of the porter and entry clerk were to be confined to such goods. But, apart from all this, the plaintiff, upon the alleged eviction, had no right to continue his equipment for performance of the contract, and thus increase the amount of the damages. Dunham v. Hastings Pavement Co., supra; 7 Am. & Eng. Enc. Law (2d Ed.) p. 153. The defendants are therefore not chargeable with office or store rent and the salary of a porter and an entry clerk. Neither should they be charged, for the period above mentioned, with the entire salary of salesmen and other employés of the plaintiff in service at the time of the alleged eviction, even though, as claimed by him, they may have been "employed by the year," because, had they been discharged before the end of their contract term, they could, by reason of the then prosperous condition of the silk business, have readily found other employment in that line of business, and thereby reduce the damages resulting from such discharge. From all this it is manifest that the commissions and profits were not identical, nor were the expenses the same, except for store rent, as claimed by the plaintiff. In the light of the above-quoted rule, laid down in Dunham v. Hastings Pavement Co., supra, there should not be great difficulty in arriving at the value of the plaintiff's contract so far as concerns the consigned goods on hand on October 19th. Proof was given of the sales of consigned goods under the contract in suit, exclusive of the Hamburg Mill account for the contract year previous to the alleged eviction, and the commissions of the plaintiff and of the defendants thereon can easily be computed. The gross amount of the expense of making sales of such goods during the period in question, when ascertained, can be apportioned equitably between the accounts in suit and the Hamburg Mill account. In making such apportionment there should

be taken into consideration the gross amount of sales of goods on all the accounts during the previous contract period and the expenses of making those sales; likewise such circumstances, if any exist, as would indicate that the apportionment should not be ratable according to the amounts of the sales, such a circumstance, for instance, as that the goods in the Hamburg Mill accounts took proportionately more or less time or trouble to sell and deliver than the goods in the accounts in suit. Due weight should also be given to any facts which either side may be able to produce which would constitute competent evidence that the proportionate expense during the period in suit would have been more or less than during former periods. When all such facts are before the jury, they can make such deduction from the gross commissions as the proofs require.

Since a new trial is to be had, it may be useful to discuss the questions arising out of the consignment of goods subsequent to the alleged eviction, and on which the jury awarded the plaintiff the entire stipulated commission of 4 per cent. The plaintiff claims, as to this branch of the case, that he is not required to show readiness to perform, because, he asserts, he was prevented by the defendants from performing the contract; and in support of such contention he cites Smith v. Wetmore, 167 N. Y. 234, 60 N. E. 419, and Flagg v. Fish, 93 App. Div. 169, 87 N. Y. Supp. 530. In both of these cases the defendant had virtually repudiated the contract and claimed not to be bound thereby, and it was held that this relieved the plaintiff from any obligation to prove performance. In the present case, however, we have no such situation. The defendants have not repudiated the contract, but merely claim that not they, but others, prevented plaintiff from performing. While the adjudications last quoted may have the effect of relieving the plaintiff in such a case as this of the obligation of proving a tender of performance in order to make out a prima facie case, they do not go to the extent of precluding the defendants from affirmatively showing that the plaintiff was unable to perform the contract at any time after the adoption of the resolutions discharging him as selling agent by the Westerhoff Bros. & Napier Company on October 10, 1904. In 7 Am. & Eng. Enc. of Law (2d Ed.) p. 146, it is stated that:

"Whether made a condition precedent or not, it demands as a prerequisite to a recovery that the complaint show either a tender of performance, or a readiness or willingness to perform, or that this willingness was rendered ineffectual by conduct of the other party, which makes compliance either unnecessary or impossible."

As before shown, the defendants did not have anything to do with the discharge of the plaintiff as selling agent by the Westerhoff Bros. & Napier Company on October 10th, and in that view it is immaterial what they did subsequent thereto, and therefore the case does not come within the principle just quoted. The plaintiff's inability to perform was produced by the act of strangers and quite independently of any act or omission of the defendants. If he was unable to perform, the defendants' so-called prevention was not a prevention. If they had never discharged him, he would have been in no better position so far as concerns the consignments now under consideration. After the resolution of October 10th he was completely disabled from consigning to

the defendants any part of the products of the mills in suit, and is therefore not entitled to any damages for the period subsequent to such disability on his part. This view is amply sustained by the decision in Nelson v. Plimpton Fireproof Elevating Co., 55 N. Y. 480, where the court, at page 484, said:

"The contract between the parties to the action was mutual, and neither could recover against the other for a breach of its terms, or put the other in default without a tender of performance, or at least proof of a readiness and willingness to perform. An actual tender of performance may be excused, when there is a willingness and an ability to perform, and actual performance has been prevented or expressly waived by the parties to whom performance is due. Franchot v. Leach, 5 Cow. (N. Y.) 506; Traver v. Halsted, 23 Wend. (N. Y.) 66; Cort v. Ambergate, etc., R. R.; 17 A. & E. (N. S.) 127; Hochester v. De La Tour, 2 E. & B. 678. The plaintiffs agreed to furnish to the defendant at its elevator in Buffalo, to be elevated and stored, between the dates mentioned, 500,000 bushels of grain, and to pay for the elevating and storage thereof a specified rate per bushel; and the defendant agreed to receive and store the grain as should be required by the plaintiffs for the stipulated compensation. The breach of the contract alleged is that the defendant refused to receive and store grain under the agreement. It is not, however, averred in the complaint that the plaintiffs or any other person had grain for delivery to the defendant to be elevated and stored, or that the plaintiffs were ready or willing or could have furnished or delivered grain to the defendant under the contract, and the proof on the trial did not cure the defect in the complaint. The proof was that neither the plaintiffs nor Lincoln & Co., who claimed rights under the agreement, had grain to be elevated or stored in Buffalo at the time of the alleged breach of the contract by the defendant or at any time thereafter, or that they were prevented from procuring and having the grain by reason of the refusal of the defendant to receive it. * * * Neither was there any competent proof of any damages sustained either by the plaintiffs or Lincoln & Co. They sustained no loss for the reason that they had no grain to store."

The principle of this decision was distinctly recognized and applied in Eddy v. Davis, 116 N. Y. 247, 22 N. E. 362, and Stern v. McKee, 70 App. Div. 142, 75 N. Y. Supp. 157. In the last quoted case the court said (page 146 of 70 App. Div., and page 160 of 75 N. Y. Supp.):

"But, had the plaintiff alleged facts showing an excuse for the nonperformance, based upon the refusal of the defendants to proceed it would have been unavailing, inasmuch as it appears, and this fact is uncontradicted, that at the time the defendants refused to perform—September 22, 1896—the plaintiff's assignor not only had not performed, but he did not then have the ability to do so. The refusal of the defendants at that time to proceed under the contract did not relieve the plaintiff's assignor from the obligations which he had assumed, nor from proving that at that time he was able, ready, and willing to proceed to carry out the contract on his part."

A case well in point is that of Leek Milling Co. v. Langford, 81 Miss. 728, 33 South. 492. There the plaintiff had agreed with the defendant that each was to furnish a machine for making shingles, and defendant was to furnish power to operate them. The plaintiff was to operate the machinery and pay the laborers to run it, while the defendant was to pay plaintiff 50 cents a 1,000 for all shingles manufactured, the agreement to last for a year. The declaration alleged that the defendant failed and refused to perform its part of the contract, and demanded damages for the breach. The plaintiff's evidence was to the effect that he had performed his part of the contract and

was ready and willing to perform it at any and all times, and that defendant had failed and refused to perform. For defendant there was evidence that the machine to be furnished by plaintiff was levied upon and taken from him. The court charged the jury: (1) That if they believed that plaintiff was "ready and willing to perform, and did make preparation to perform, said contract on his part thereof, but that he was prevented from performing his part" by defendant, then plaintiff could recover. (2) That if they believed plaintiff "did perform, and was at all times ready and willing to do and perform, his part of the contract, but that defendant refused so to do, defendant is liable." These instructions were held erroneous, the court saying:

"The instructions given for the appellee in this case are erroneous in failing to predicate the appellee's right to recover upon his being able or in a condition to perform the covenants on his part contained in the contract. * * * The covenants in this contract were mutual and interdependent. Appellee could only hold defendant to compliance by showing that he had himself fulfilled the covenants on his part. This he was not in a condition to do, if it be the fact that as fast as he got the machinery it was taken away from him by the vendors because of his failure to pay. We think the instructions omitted this necessary qualification."

The plaintiff claims that:

"There was ample remedy in equity for both Napier and Spielmann to obtain a mandatory injunction for a specific performance of the contract, and to prevent them from entering into any other contracts with other persons which would subject Napier to a loss of his contract with Spielmann & Co."

No authorities are cited in support of this proposition, and I have been unable to find any. In fact, the cases seem to hold the contrary. See cases cited in 22 Cyc. 852. The plaintiff did not pursue such remedy, and I fail to perceive why the defendants should have done so, even if they were in position to do so, upon the theory of a privity of contract between them and the Westerhoff Bros. & Napier, Company. If, as claimed, the Westerhoff Bros. & Napier Company was bound by the contract in suit, it was merely so in conjunction with the plaintiff, and its refusal to further consign goods to the defendants was equivalent to the plaintiff's refusal as matter of law.

The plaintiff also urges that the defendants were under some sort of obligation to bring an action against the Westerhoff Bros. & Napier Company to compel specific performance of the contract; but it is an unheard-of proposition that where, as here, a contracting party has failed to induce the concern of which he is a member to do what he agreed it should do, the other party to the contract should be required to bring an action for specific performance, instead of being permitted, at his election, to set up such breach as a defense in an action by the contractor, or to press such other remedies as he may have. For the reasons above set forth, as well as for others urged in support of the motion, but not discussed by me, the verdict should be set aside, and a new trial granted.

Motion granted. Settle order on notice.